*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *MORGAN CALVI,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 05-11-P-S* |
| | ) | |
| *CITY OF ROCKLAND, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

*RECOMMENDED DECISION ON DEFENDANTS'*
*MOTIONS FOR SUMMARY JUDGMENT*

In this action arising from the January 19, 2003 arrest and booking of plaintiff Morgan Calvi,

two sets of defendants move for summary judgment as to all counts against them. *See* Defendants City

of Rockland, Kenneth J. Smith and Jeffrey McLaughlin's Motion for Summary Judgment, etc.

("Rockland S/J Motion") (Docket No. 38); Defendants Knox County, Daniel Davey and Rebecca

Gracie's Motion for Summary Judgment, etc. ("Knox S/J Motion") (Docket No. 40); *see also*

Complaint for Violation of Civil Rights and Pendent State Claims ("Complaint") (Docket No. 1).[1]

For the reasons that follow, I recommend that both motions be granted.

### I.  Summary Judgment Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] The court previously granted a motion by Calvi to dismiss her complaint against two defendants, Alfred Ockenfels and Officer O'Donnell. *See* Docket Nos. 19, 22. The sets of defendants now moving for summary judgment comprise all remaining named defendants in the case.

56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## B.  Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District.  *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record

citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(e).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted." (citations and internal punctuation omitted).

## II.  Rockland Defendants' Motion

### A.  Factual Context

With respect to the motion for summary judgment of the City of Rockland, Kenneth J. Smith and Jeffrey McLaughlin (the "Rockland Defendants"), the parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56 and viewed in the light most favorable to Calvi as nonmovant, reveal the following relevant to this recommended decision:

At all times relevant to this action, and for approximately seven years, Kenneth Smith was employed as a police officer with the City of Rockland Police Department ("Rockland PD"); he has held the rank of sergeant for the past year and a half.  Defendants City of Rockland, Kenneth J. Smith and Jeffrey McLaughlin's Statement of Material Facts ("Rockland SMF") (Docket No. 39) ¶ 1; Plaintiff[] Morgan Calvi's Response to Defendants City of Rockland, Kenneth Smith and Jeffrey McLaughlin's Statement of Material Facts with Additional Statements of Material Fact ("Plaintiff's Opposing SMF/Rockland") (Docket No. 44) ¶ 1.  On January 19, 2003 Smith held the rank of patrolman.  *Id*. ¶ 2.  Prior to becoming a police officer, he had served in the armed forces as a medical specialist and later worked at a hospital.  *Id*. ¶ 3.  Smith has completed both the reserve-officer training course and the full patrol-officer training course presented by the Maine Criminal Justice Academy, is certified to function as a law-enforcement officer in the State of Maine and has an associate's degree in criminal justice.  *Id*. ¶ 4.

On January 19, 2003 Smith was dispatched to 89 Talbot Avenue in Rockland following a 911 call to the Knox County Dispatch Center.  *Id*. ¶ 5.  The male caller had reported that a female in the house was brandishing a knife and that he had locked himself in his room.  Rockland SMF ¶ 6;

Affidavit of Kenneth J. Smith ("Smith Aff."), attached to Rockland SMF, ¶ 2.[2]  Sergeant Jeffrey McLaughlin of the Rockland PD also responded to the scene.  Rockland SMF ¶ 7; Plaintiff's Opposing SMF/Rockland ¶ 7.  Smith was familiar with the address because he had been dispatched there the previous day.  *Id*. ¶ 8.  Several people, most of them unrelated, lived in the residence, which was owned by Lawrence Frier.  *Id*. ¶ 9.  Some of the people apparently paid rent, while others worked for Frier in exchange for their housing.  *Id*. ¶ 10.  In the previous day's trouble call, Calvi, one of the residents, had reported that another resident, an unrelated male named Kevin Warren, had been verbally abusive to her and had spread rumors about her over the Internet.  *Id*. ¶ 11.  Frier, who apparently was Calvi's boyfriend, had assured Smith that the situation was under control and that police intervention was not warranted.  Rockland SMF ¶ 12; Smith Aff. ¶ 2.  By the time Smith arrived, Warren had left the residence.  Rockland SMF ¶ 13; Smith Aff. ¶ 2.[3]  Because this seemed to Smith to be nothing but a verbal dispute between two unrelated roommates of the house that had now at least resolved temporarily with Warren's departure from the scene, Smith left the residence.  Rockland SMF ¶ 14; Smith Aff. ¶ 2.[4]

When Smith was dispatched to the same address the following day, he asked the dispatcher if the woman alleged to be brandishing a knife was the female with whom he had spoken the day before, Morgan Calvi.  Rockland SMF ¶ 15; Plaintiff's Opposing SMF/Rockland ¶ 15.  The dispatcher confirmed that Calvi was the person whom the caller had identified as brandishing a knife.  Rockland

---

[2] In this and a number of other instances, Calvi lodges a hearsay objection.  *See generally* Plaintiff's Opposing SMF/Rockland.  I overrule that objection with respect to the following statements on the basis that they are not offered for the truth of the underlying matter asserted, but rather to show what Smith, McLaughlin or both officers were told or observed as events unfolded: Rockland SMF ¶¶ 6, 12, 15, 22, 26, 28, 30-34, 37, 39.

[3] I omit the remainder of paragraph 13, which Calvi disputes.  *See* Plaintiff's Opposing SMF/Rockland ¶ 13; Affidavit of Morgan F. Calvi ("Calvi Aff."), attached to *id*., ¶ 4.

[4] I omit the balance of paragraph 14, sustaining Calvi's objection to the statement that "no arrestable offense had been reported to Officer Smith" on the ground that it is conclusory.  *See* Plaintiff's Opposing SMF/Rockland ¶ 14.  Calvi's remaining objections are overruled.  While Calvi denies that her dispute with Warren was merely verbal, *see id*., her denial does not controvert Smith's statement that he perceived it as such.

SMF ¶ 15; Smith Aff. ¶ 2.[5]  When McLaughlin and Smith arrived at the scene, no one met them outside, and Smith could not see anyone inside the house.  Rockland SMF ¶ 16; Plaintiff's Opposing SMF/Rockland ¶ 16.  Smith had the dispatcher call the phone number to the house.  *Id*. ¶ 17.  Frier then came outside.  Rockland SMF ¶ 17; Smith Aff. ¶ 3.[6]  Smith asked Frier what he knew about the female with the knife, and he replied, "Nothing I want to talk to you about."  Rockland SMF ¶ 18; Plaintiff's Opposing SMF/Rockland ¶ 18.  When Smith asked Frier where Calvi was, he said she was downstairs, and he would go get her.  *Id*. ¶ 19.  When Frier came back outside, however, he said Calvi was not downstairs, and he did not know where she had gone.  *Id*. ¶ 20.

At that point Warren called dispatch and asked if it was safe for him to return to the residence.  Rockland SMF ¶ 22; Smith Aff. ¶ 4.  He was told that it was and that McLaughlin and Smith were at the house.  *Id*.  Warren returned to the house with an audiotape, to which McLaughlin and Smith listened.  Rockland SMF ¶¶ 23-24; Plaintiff's Opposing SMF/Rockland ¶¶ 23-24.[7]  Smith could hear accusations being made about Warren by Calvi, who sounded very angry and upset.  Rockland SMF ¶ 25; Smith Aff. ¶ 4.[8]  Frier is also heard on the tape, admonishing Calvi to be reasonable and at one point exclaiming, "Morgan, that's a felony."  Rockland SMF ¶ 26; Smith Aff. ¶ 4.  Smith heard the sound of a door closing and Calvi yelling at Warren.  Rockland SMF ¶ 27; Smith Aff. ¶ 4.[9]  Warren advised Smith that Calvi, Frier, Matthew Hayden and he were present when the tape was made inside

---

[5] Calvi's objection to this statement on ground that it lacks foundation, *see* Plaintiff's Opposing SMF/Rockland ¶ 15, is overruled.  Smith lays an adequate foundation: He personally heard the dispatcher's comments.

[6] I omit the Rockland Defendants' further statement that the dispatcher spoke to Frier, *see* Rockland SMF ¶ 17, sustaining Calvi's objection that it lacks foundation, *see* Plaintiff's Opposing SMF/Rockland ¶ 17.

[7] I omit a portion of paragraph 23, *see* Rockland SMF ¶ 23, sustaining Calvi's objection on the ground that Smith does not explain the basis for his knowledge that the tape was of the confrontation that had just taken place, *see* Plaintiff's Opposing SMF/Rockland ¶ 23.

[8] Calvi's objection to Smith's description of the contents of the audiotape, *see* Plaintiff's Opposing SMF/Rockland ¶ 25, is overruled.  Smith, who personally listened to the audiotape and was familiar with Calvi's voice (having heard it during his visit to the residence the previous day), was in a position to identify the voice on the tape as hers.  *See* Fed. R. Evid. 901(b)(5).

[9] I have omitted portions of this statement, *see* Rockland SMF ¶ 27, sustaining Calvi's objection that Smith merely speculated that he heard Warren leaving, *see* Plaintiff's Opposing SMF/Rockland ¶ 27.  I overrule Calvi's objection that the voice on the tape is not properly identified as hers.  *See id*.

the house.  Rockland SMF ¶ 28; Smith Aff. ¶ 4.  Smith secured the tape that Warren had made of the altercation for evidence.  Rockland SMF ¶ 29; Plaintiff's Opposing SMF/Rockland ¶ 29.  Frier indicated that the residents of the house had been having a meeting about things that had been going on there.  Rockland SMF ¶ 30; Smith Aff. ¶ 5.  Frier further indicated that Calvi got angry, but he refused to say anything about her brandishing a knife.  Rockland SMF ¶ 31; Smith Aff. ¶ 5.  Smith then heard a person calling from upstairs, "Is it safe to come down?  Where is she?"  Rockland SMF ¶ 32; Smith Aff. ¶ 5.[10]  This person was Hayden, who had locked himself in his room before calling 911.  Rockland SMF ¶ 33; Smith Aff. ¶ 5.  As Hayden started down the stairs, he again asked the officers: "Where is she?"  Rockland SMF ¶ 34; Smith Aff. ¶ 5.  Smith assured Hayden that he could come down safely but also indicated that the officers did not know Calvi's whereabouts.  Rockland SMF ¶ 35; Smith Aff. ¶ 5.[11]  When Hayden spoke to Smith, he was clenching his hands and shaking and kept looking around.  Rockland SMF ¶ 36; Smith Aff. ¶ 5.[12]  It was Smith's observation that Hayden had truly been frightened for his life by whatever Calvi had done.  Rockland SMF ¶ 37; Smith Aff. ¶ 5.[13]

Hayden and Warren were both asked to come to the police station and provide written statements about the altercation during which Calvi had brandished a knife.  Rockland SMF ¶ 38; Smith Aff. ¶ 5.[14]  McLaughlin advised Frier that he could bring Calvi to the station when he located her or that the officers could come back later to get her.  Rockland SMF ¶ 39; Smith Aff. ¶ 6.

---

[10] Calvi's objection to this statement predicated on lack of foundation, *see* Plaintiff's Opposing SMF/Rockland ¶ 32, is overruled. Smith was present and personally heard the individual call out.

[11] I omit a portion of this statement in which the Rockland Defendants assert that Smith could hear in Hayden's voice that he was still fearful of Calvi, *see* Rockland SMF ¶ 35, sustaining Calvi's objection that this is a conclusory statement for which Smith lays no foundation, *see* Plaintiff's Opposing SMF/Rockland ¶ 35.

[12] I omit a portion of this statement in which the Rockland Defendants assert that Hayden was looking around for Calvi, *see* Rockland SMF ¶ 36, sustaining Calvi's objection that this is speculative, *see* Plaintiff's Opposing SMF/Rockland ¶ 36.

[13] Calvi's objections that this statement is conclusory and without foundation, *see* Plaintiff's Opposing SMF/Rockland ¶ 37, are overruled.  Smith lays an adequate foundation for this lay opinion by describing in concrete terms Hayden's appearance and conduct. *See* Smith Aff. ¶ 5; *see also* Fed. R. Evid. 701.

[14] Calvi's objections to use of the witness statements as exhibits, *see* Plaintiff's Opposing SMF/Rockland ¶ 38, are moot.  Even if the exhibits were stricken, Smith's affidavit would still support the statement.

McLaughlin and Smith went outside on the porch and waited for Hayden and Warren, who were going to give statements. Rockland SMF ¶ 40; Smith Aff. ¶ 6.[15]  While the officers were waiting outside, Frier produced Calvi. Rockland SMF ¶ 41; Smith Aff. ¶ 6.[16]  Smith asked Calvi where the knife was, and she advised him it was in the kitchen. Rockland SMF ¶ 42; Plaintiff's Opposing SMF/Rockland ¶ 42.  McLaughlin found two knives in the kitchen, a small steak knife and a large butcher knife. *Id*. ¶ 43.  Calvi identified the butcher knife as the one she had been holding during the altercation. *Id*. ¶ 45.[17]  At that point, Smith placed Calvi under arrest and placed her in handcuffs, double-locking them so that they would not further tighten. *Id*. ¶ 46.[18]

Calvi indicated she wanted to tell Smith her side of the story, and he told her that she could give him a statement at the Knox County Jail ("Jail") after she had been read *Miranda* warnings because she was under arrest. *Id*. ¶ 48.  Frier gave Calvi some medications she was taking and some cash for bail money. *Id*. ¶ 49.  Smith walked Calvi out to his police cruiser, put her in the passenger seat, belted her in with the seatbelt and then transported her to the Jail for booking and processing. *Id.* ¶ 50.[19]  Calvi walked outside with Smith and realized there was a second officer under the carport. *Id*. ¶ 51.[20]  Smith, who has a background that includes training as a medical specialist in the military and employment by a civilian hospital, did not observe that Calvi had any type of infirmity or

---

[15] Calvi's objection to this statement on grounds that, as to McLaughlin, it is without foundation, speculative and based on hearsay, *see* Plaintiff's Opposing SMF/Rockland ¶ 40, is overruled. Smith's presence at the scene, working in tandem with McLaughlin, provides adequate foundation for his observations concerning McLaughlin's conduct and purpose at that moment. No hearsay "statement" of McLaughlin is implicated. *See* Fed. R. Evid. 801(a).

[16] I omit the balance of this statement, *see* Rockland SMF ¶ 41, sustaining Calvi's objection that Smith provides no foundation for knowledge that Calvi had been in a bathroom off the entrance foyer, *see* Plaintiff's Opposing SMF/Rockland ¶ 41.

[17] My recitation incorporates Calvi's qualification. I omit paragraph 44 of the Rockland SMF, which Calvi disputes. *Compare* Rockland SMF ¶ 44 *with* Plaintiff's Opposing SMF/Rockland ¶ 44; *see also* Deposition of Morgan Calvi ("Calvi Dep."), attached to Rockland SMF, at 19.

[18] I omit Calvi's statement that Smith was aware that she was disabled, *see* Additional Statements of Material Fact ("Plaintiff's Additional SMF/Rockland"), commencing at page 10 of Plaintiff's Opposing SMF/Rockland, ¶ 127, which is neither admitted nor supported by the citation given.

[19] I omit the balance of this statement, *see* Rockland SMF ¶ 50, sustaining Calvi's objection that Smith lays no foundation for knowledge of how all Rockland arrests usually are handled, *see* Plaintiff's Opposing SMF/Rockland ¶ 50.

[20] I omit paragraph 52 of the Rockland SMF, which Calvi disputes. *Compare* Rockland SMF ¶ 52 *with* Plaintiff's Opposing (*continued on next page*)

disability.  Rockland SMF ¶ 53; Smith Aff. ¶ 8.[21]  Smith did observe Calvi crying when he transported her to the Jail.  Plaintiff's Additional SMF/Rockland ¶ 128; Defendants City of Rockland, Kenneth J. Smith and Jeffrey McLaughlin's Reply Statement of Material Facts ("Rockland Reply SMF") (Docket No. 48) ¶ 128.[22]

Calvi had a birth defect and, as a result, three fingers on her left hand had to surgically straightened, one in 1972 and the other two in 1991.  Rockland SMF ¶ 54; Plaintiff's Opposing SMF/Rockland ¶ 54.  In January 2003 Calvi was able to function, work, feed herself and clothe herself and was not limited in those activities by her hand birth defect.  Id. ¶ 55.  Calvi was able to work an eight-hour shift at Wal-Mart, first as a cashier and then answering phones.  Id. ¶ 56.  Calvi worked at Wal-Mart from 1997 until 2003, continuing to work after her arrest on January 19, 2003.  Id. ¶ 57.[23]

When placing handcuffs on Calvi, Smith did not see any physical condition of her hands or wrists that would interfere with his ability to handcuff her safely and properly.  Rockland SMF ¶ 60; Smith Aff. ¶ 8.[24]  Calvi was handcuffed only for a period of ten to fifteen minutes.  Rockland SMF ¶ 61; Plaintiff's Opposing SMF/Rockland ¶ 61.[25]  Calvi is now claiming that her middle finger was broken during either the fingerprinting process or in the process of Smith's handcuffing her.  Id. ¶ 63.[26]

---

SMF/Rockland ¶ 52; *see also* Calvi Aff. ¶¶ 6, 9-11.

[21] Calvi's objection to this statement on the ground that Smith has not been designated or qualified as an expert, *see* Plaintiff's Opposing SMF/Rockland ¶ 53, is overruled.  Smith need not be an expert to testify as to his observations.

[22] My recitation incorporates the Rockland Defendants' qualification.

[23] Calvi qualifies this statement, asserting that she was only working eight hours a week after the incident on January 19, 2003 and gave that work up sometime after the incident.  *See* Plaintiff's Opposing SMF/Rockland ¶ 57; Calvi Dep. at 81-82.

[24] Calvi's objection to this statement on the ground that Smith has not been designated or qualified as an expert, *see* Plaintiff's Opposing SMF/Rockland ¶ 60, is overruled.  Smith need not be an expert to testify as to his observations.  I omit paragraphs 58, 59 and 62 of the Rockland SMF.  The parties dispute whether Calvi apprised Smith, after the handcuffing and/or during transport to the Jail, that the handcuffs were causing pain and/or discomfort.  *Compare* Rockland SMF ¶¶ 58-59, 62 *with* Plaintiff's Opposing SMF/Rockland ¶¶ 58-59, 62; *see also* Calvi Aff. ¶¶ 9-11.

[25] I omit paragraphs 86 and 87 of the Rockland SMF, *see* Rockland SMF ¶¶ 86-87, to which Calvi objects, *see* Plaintiff's Opposing SMF/Rockland ¶¶ 86-87, and which essentially reiterate the same point made in paragraph 61.

[26] I omit paragraph 64 of the Rockland SMF, *see* Rockland SMF ¶ 64, sustaining Calvi's objection that the Rockland Defendants fail to authenticate or lay a foundation for admission of the records of Kevin Olehnik, M.D., *see* Plaintiff's Opposing SMF/Rockland ¶ 64.

Smith arrested Calvi on a charge of criminal threatening with a dangerous weapon, a Class C felony. *Id*. ¶ 65. Smith was the arresting officer who took Calvi into custody and handcuffed her. *Id*. ¶ 72. While McLaughlin was also present at the scene, he did not arrest Calvi or ever have any physical contact with her. *Id*. ¶ 73. McLaughlin was mainly involved with the two witnesses, Hayden and Warren, and later got statements from them at the Rockland police station while Smith was transporting Calvi to the Jail. Rockland SMF ¶ 74; Smith Aff. ¶ 10.[27]

The Rockland PD does not have a secure lockdown facility, and arrestees are usually transported directly to the Jail for booking and processing by corrections officers there. Rockland SMF ¶ 84; Plaintiff's Opposing SMF/Rockland ¶ 84. Actual travel time from the scene of Calvi's arrest to the Knox County Jail was approximately five to six minutes. *Id*. ¶ 85. Upon arrival at the Jail, Calvi was immediately transferred from the custody of Smith to that of Knox County corrections officers. *Id*. ¶ 88. The handcuffs on arrestees are removed by the corrections officer and not by the arresting officer, pursuant to Jail policy. *Id*. ¶ 89.[28] While Smith remained at the Jail to take Calvi's statement, from the time they arrived at the facility Calvi was in the custody of Knox County corrections officers. *Id*. ¶ 90. The fingerprinting of Calvi was not done by Smith but was done by one of the Knox County corrections officers, pursuant to Jail policy. *Id*. ¶ 91. A Rockland officer bringing an arrestee to the Jail fills out the information on the fingerprinting card but is not involved in the actual fingerprinting of the arrestee. *Id*. ¶ 92. Smith had no role in fingerprinting Calvi on January 19, 2003 and did not observe the fingerprinting taking place. *Id*. ¶ 93.

During the entire time Smith interacted with Calvi both on January 18 and January 19, 2003, he did not observe any type of infirmity or disability that required any special accommodation on his part.

---

[27] While Calvi purports to deny this statement in part, her assertion that McLaughlin was the supervisory officer at the scene while Smith was a patrol officer, *see* Plaintiff's Opposing SMF/Rockland ¶ 74, does not controvert the underlying statement.

[28] Calvi qualifies this statement, asserting that while this may have been Jail policy, it is not what happened in her case. *See* Plaintiff's
(*continued on next page*)

Rockland SMF ¶ 100; Smith Aff. ¶ 15.[29]  There was nothing about Calvi's wrists or hands that, to

Smith's observation, would have caused him to believe that handcuffs could not be applied safely to

her in the usual manner used for all arrestees.  Rockland SMF ¶ 101; Smith Aff. ¶ 15.[30]  Calvi was

cooperative throughout the entire process, which meant Smith was not required to use any physical

force to take her into custody other than placing handcuffs on her wrists.  Rockland SMF ¶ 104; Smith

Aff. ¶ 15.[31]  Calvi suffered an injury to her wrist and finger when she was handcuffed by Smith on

January 19, 2003 that caused her to suffer severe physical limitations and extreme emotional distress.

Plaintiff's Additional SMF/Rockland ¶ 133; Calvi Aff. ¶¶ 8-14.[32]

Both at the Maine Criminal Justice Academy and at the Rockland PD, Smith received training

in the proper use of physical force in connection with an arrest.  Rockland SMF ¶ 108; Plaintiff's

Opposing SMF/Rockland ¶ 108.  Through this training, Smith has been made aware of the limitations

imposed by state and federal law on the lawful use of force in connection with an arrest.  Rockland

SMF ¶ 109; Smith Aff. ¶ 16.[33]  Smith has not had any formal training on handcuffing individuals with

physical disabilities.  Plaintiff's Additional SMF/Rockland ¶ 129; Rockland Reply SMF ¶ 129.[34]

---

Opposing SMF/Rockland ¶ 89; Calvi Aff. ¶ 11.

[29] I omit the balance of this statement, *see* Rockland SMF ¶ 100, as well as paragraph 102, *see id*. ¶ 102, inasmuch as the parties dispute whether Calvi complained to Smith that the handcuffs were causing her injury and/or pain, *compare id*. ¶¶ 100, 102; Smith Aff. ¶ 15 *with* Plaintiff's Opposing SMF/Rockland ¶¶ 100, 102; Calvi Aff. ¶¶ 9-11.

[30] Calvi purports to deny this statement, *see* Plaintiff's Opposing SMF/Rockland ¶ 101, but her assertion does not controvert it.

[31] I omit the Rockland Defendants' characterization of Calvi as having been "calm," Rockland SMF ¶ 104, which she disputes, *see* Plaintiff's Opposing SMF/Rockland ¶ 104; Calvi Aff. ¶¶ 10-11.

[32] The Rockland Defendants' objection to this statement on the ground that it is based on hearsay (Calvi's own recitation of physicians' purported diagnoses that are nowhere of record), *see* Rockland Reply SMF ¶ 133, is overruled.  Calvi's statement is based not only on physicians' diagnoses but also on her own personal observations and experience.  *See* Calvi Aff. ¶¶ 8-14.  The Rockland Defendants alternatively deny the statement on the grounds that it is false, unsubstantiated and contradicted by ample additional evidence of record, including the treatment records of one of her doctors, *see* Rockland Reply SMF ¶ 133; however, I view the cognizable evidence in the light most favorable to Calvi as nonmovant.

[33] Calvi's objections to this statement on grounds that no foundation is laid to establish the nature of the officer's training and that the statement is conclusory, *see* Plaintiff's Opposing SMF/Rockland ¶ 109, are overruled.  While Smith does not provide great detail, he makes clear that he received this training at the Maine Criminal Justice Academy and the Rockland PD and that it covered the subject of limitations on the use of force.  *See* Smith Aff. ¶ 16.  While Calvi alternatively purports to deny the statement, *see* Plaintiff's Opposing SMF/Rockland ¶ 109, her assertion does not effectively controvert it.

[34] The Rockland Defendants qualify this statement.  *See* Rockland Reply SMF ¶ 129.  Inasmuch as the essence of their qualification is (*continued on next page*)

Bruce Boucher is employed by the City of Rockland as its chief of police and has held that position since July 2005. Rockland SMF ¶ 111; Plaintiff's Opposing SMF/Rockland ¶ 111. Boucher has not changed the City of Rockland's policies regarding Use of Force, Arrest Procedures, Prisoner Transportation or Response to Deviant Behavior since he has been chief of police. *Id.* ¶ 112. City of Rockland police officers undergo training in arrests of people with disabilities through the Maine Criminal Justice Academy's basic law-enforcement program. *Id.* ¶ 113.[35] Under the Rockland PD policy in force at the time of Calvi's arrest, an impairment that caused an individual's hand to be crooked or disabled could be an impairment that would make it inappropriate to handcuff an individual. Plaintiff's Additional SMF/Rockland ¶ 131; Rockland Reply SMF ¶ 131.[36] Under the Rockland PD policy in force at the time of Calvi's arrest, it was appropriate for an arresting officer to consider handcuffing an individual with his or her hands in front of him or her if a person complained or indicated he or she had an injury or disability. *Id.* ¶ 132.[37]

At all times relevant to this action, Thomas J. Hall has been employed by the City of Rockland as its city manager. Rockland SMF ¶ 115; Plaintiff's Opposing SMF/Rockland ¶ 115. City of Rockland police officers are provided coverage for civil liability arising out of their employment through the City of Rockland's membership in the Maine Municipal Association Property & Casualty Pool, a self-insured pool of municipalities within the State of Maine. *Id.* ¶ 116. The coverage

---

set forth elsewhere in this recitation, I shall not repeat it here.

[35] I omit paragraph 130 of the Plaintiff's Additional SMF/Rockland (asserting that pursuant to Rockland PD policy it was inappropriate to handcuff an individual who had a medical condition or physical impairment), *see* Plaintiff's Additional SMF/Rockland ¶ 130, sustaining the Rockland Defendants' objection that it mischaracterizes the testimony of Boucher on which it relies, *see* Rockland Reply SMF ¶ 130; Deposition of Bruce Boucher ("Boucher Dep."), attached to Rockland SMF, at 10.

[36] The Rockland Defendants qualify this statement, asserting that while Boucher acknowledged that the specific hand condition referenced in Calvi's statement "may be" a condition that would fit the exception to Rockland's policy that all prisoners being transported be handcuffed with their hands behind them, he also testified that the decision is based on the officer's other observations and the totality of the circumstances. *See* Rockland Reply SMF ¶ 131; Boucher Dep. at 9-11.

[37] The Rockland Defendants qualify this statement, asserting that the decision of an arresting officer to consider handcuffing an individual with his or her hands in front of him or her was based upon the totality of the circumstances, not merely a subjective representation by the arrestee that he or she had an injury or disability, which circumstances included the visible presence of (*continued on next page*)

provided is detailed in the Members' Coverage Certificate No. 13100-0104, which was in effect on January 19, 2003 and represents all of the coverage available to the municipality and officers for liability arising out of the Calvi claim. *Id*. ¶ 117. The City of Rockland does not have any policy of liability insurance that provides indemnity to the city or its police officers for civil liability arising out of the events of January 19, 2003. *Id*. ¶ 118.

### B. Analysis

Calvi brings a four-count complaint, *see* Complaint ¶¶ 14-28, which she describes as arising under the United States Constitution, the Civil Rights Act of 1871 (42 U.S.C. § 1983) and pendent state law, *see id*. ¶ 1. As the Rockland Defendants suggest, *see* Rockland S/J Motion at 9-10, the Complaint is hardly a model of clarity, omitting to supply the precise legal basis for any of the four individual counts, *see* Complaint ¶¶ 14-28. Nonetheless, Count I, which is predicated on the handcuffing and fingerprinting of Calvi, reasonably can be construed as setting forth a claim pursuant to section 1983 and/or its Maine counterpart, the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4681 *et seq*., of use of excessive force in contravention of the Fourth Amendment of the United States Constitution and/or its Maine counterpart. *See id*. ¶¶ 14-22. Count II sets forth a claim of municipal liability against Knox County and the City of Rockland. *See id*. ¶¶ 23-24. Count III apparently asserts state-law tort claims predicated on the fingerprinting incident, and Count IV appears to set forth a claim pursuant to the MCRA of use of excessive force in violation of the federal and/or state constitutions. *See id*. ¶¶ 25-28.

The Rockland Defendants seek summary judgment as to all claims against them on the bases that:

---

an injury and the observations and other information available to the officer. *See* Rockland Reply SMF ¶ 132; Boucher Dep. at 9-11.

1.      Count III arises solely from the fingerprinting episode, with which they had nothing to do.  *See* Rockland S/J Motion at 9.

2.      To the extent that Calvi is seen as adequately pleading a claim pursuant to the Americans with Disabilities Act ("ADA") – a proposition that the Rockland Defendants dispute – her hand condition did not constitute a "disability" requiring accommodation pursuant to the ADA.  *See id.* at 9-11.

3.      Calvi's excessive-force claims against McLaughlin fail inasmuch as he neither took her into custody, placed handcuffs on her or fingerprinted her and was not in any position to intervene to stop any alleged use of excessive force.  *See id*. at 11.  Calvi made no complaints about her handcuffs at the scene, the one spot at which McLaughlin was present.  *See id*. at 12.

4.      Calvi's excessive-force claims against Smith fall short inasmuch as (i) Smith had probable cause to effectuate her arrest (and, in any event, she does not allege that she was unlawfully arrested), (ii) an officer making an arrest has a right to use a reasonable degree of force to effectuate it, and (iii) Smith used only the degree of force minimally necessary to control Calvi, who had only a short time before menaced two men with a large butcher knife.  *See id*.  In the alternative, Smith is entitled to qualified immunity inasmuch as a reasonable police officer in his position would not have viewed the placement of double-locked handcuffs on Calvi for a short transport to the Jail as unlawful or likely to cause injury (and, in fact, there is a lack of any demonstrated injury to Calvi).  *See id*. at 13.  As to any claim arising under the Maine Tort Claims Act ("MTCA"), Smith is immune pursuant to 14 M.R.S.A. § 8111(1).  *See id*. at 15.

5.      As concerns Calvi's attempt to hold the City of Rockland liable pursuant to section 1983, she fails to demonstrate any unconstitutional custom, policy or practice of deliberate indifference to the supervision or training of personnel, specifically regarding arrests and/or the

unlawful use of force in connection with arrests. *See id*. at 16. Even if she could prove inadequate training in arrests and/or use of force, her claim would fail because she cannot demonstrate a causal connection between any such default and her asserted injuries. *See id*. at 16-19. Finally, with respect to any state-law claims, the City of Rockland is absolutely immune pursuant to the MTCA. *See id*. at 19.

As the Rockland Defendants protest in their reply brief, *see* Defendants City of Rockland, Kenneth J. Smith and Jeffrey McLaughlin's Reply Memorandum in Support of Summary Judgment ("Rockland S/J Reply") (Docket No. 47) at 1, Calvi devotes a good deal of space in her opposing brief to theories of liability that are not even vaguely discernible in her complaint: most notably, that (i) Smith made an illegal entry into her residence and/or arrested her without probable cause (as a result of which any use of force against her was excessive), (ii) Smith and Warren possibly conspired against Calvi, and (iii) McLaughlin knew or should have known that the residence was being entered illegally and that Calvi was being arrested without probable cause, yet failed to intervene to prevent these illegalities, *compare generally* Plaintiff Morgan Calvi's Memorandum in Opposition to the City of Rockland, Kenneth Smith and Jeff[]rey McLaughlin's Motion for Summary Judgment ("Plaintiff's S/J Opposition/Rockland") (Docket No. 43) *with* Complaint.

A plaintiff cannot seek to resist summary judgment by cobbling together, for the first time in an opposition memorandum, entirely new theories of liability – at least not where, as here, no excuse is offered for such tardiness. *See, e.g., Logiodice v. Trustees of Me. Cent. Inst.*, 170 F. Supp.2d 16, 30-31 n.12 (D. Me. 2001), *aff'd*, 296 F.3d 22 (1st Cir. 2002) (declining to consider "theory of liability . . . not detectable in the Complaint"; observing, "Plaintiffs are not entitled to raise a new theory of liability for the first time in opposition to a motion for summary judgment."); *see also, e.g., Torres-Rios v. LPS Labs., Inc.*, 152 F.3d 11, 15-16 (1st Cir. 1998) (district court did not abuse discretion in

denying, as belated, motion to amend complaint to add claim raised for first time in opposition to motion for summary judgment).  Inasmuch as these points were neither timely nor fairly raised, I will not consider them.

Calvi seemingly does not press a standalone ADA claim, although she alludes to the ADA in the context of discussing other points.  *See, e.g.,* Plaintiff's S/J Opposition/Rockland at 9-10, 12.  To the extent that she does mean to raise such a standalone claim, I agree with the Rockland Defendants that it is not adequately pleaded in her complaint (and thus cannot be raised for the first time in opposition to their motion for summary judgment).[38]

I move on to consider the Rockland Defendants' bid for summary judgment with respect to those claims fairly in play.

### 1.  State-Law Tort Claims: Count III

As the Rockland Defendants note, *see* Rockland S/J Motion at 9, and Calvi does not dispute, *see generally* Plaintiff's S/J Opposition/Rockland, Count III raises claims arising only from the fingerprinting done of Calvi subsequent to her arrest, *see* Complaint ¶¶ 25-26.  Calvi adduces no evidence that any of the Rockland Defendants had anything to do with the fingerprinting.  Accordingly, they are entitled to summary judgment as to Count III.

---

[38]  Even were an ADA claim cognizable, it would not survive summary judgment.  Pursuant to the ADA, a person is considered disabled, and thus entitled to the ADA's protections, only if he or she has "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [that] individual; (B) a record of such an impairment; or (C) [been] regarded as having such an impairment."  42 U.S.C. § 12102(2).  Calvi adduces no evidence from which a trier of fact reasonably could conclude that, on January 19, 2003, her hand deformity and/or any other condition substantially limited her in one or more major life activities, she had a record of such an impairment, or she was regarded (by the Rockland PD or anyone else) as having such an impairment.

## 2.  Excessive-Force Claims: Counts I and IV[39]

### a.  McLaughlin

In her complaint, Calvi seemingly predicates McLaughlin's liability for asserted use of excessive force on her allegation that he "assisted" Smith in placing her in handcuffs.  *See id.* ¶ 14.  In fact, the evidence is uncontroverted that McLaughlin did not aid Smith in handcuffing Calvi.  *See* Rockland SMF ¶¶ 72-73; Plaintiff's Opposing SMF/Rockland ¶¶ 72-73.  Assumedly to overcome this obstacle, Calvi shifts gears, asserting that McLaughlin should be held liable because he knew or should have known that the handcuffing of Calvi violated Rockland PD policy and constituted excessive force yet failed to intervene to prevent this illegality.  *See* Plaintiff's S/J Opposition/Rockland at 12-13.

As a threshold matter, the Rockland Defendants protest that this theory is not discernible in the Complaint.  *See* Rockland S/J Reply at 3-4.  I agree.  *See* Complaint ¶¶ 14-28.  Nonetheless, in this instance, the Rockland Defendants themselves sought summary judgment with respect to McLaughlin on grounds, *inter alia*, that he could not be held liable for failure to intervene with respect to the handcuffing.  *See* Rockland S/J Motion at 11-12.  In so doing, they added no caveat that they considered any such claim unpleaded or inadequately pleaded in the Complaint.  *See id.*  I therefore will reach its merits.

"[A] police officer who fails to prevent the use in his presence of excessive force by another police officer may be held liable under § 1983."  *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1228-29 n.4 (D. Me. 1996) (citation and internal quotation marks omitted).  To be held liable, the onlooking officer must have had a "realistic opportunity" to prevent the use of excessive force.  *See,*

---

[39] The same analysis pertains with respect to Calvi's claims of use of excessive force pursuant to section 1983 and the MCRA.  *See, e.g., Ms. K v. City of S. Portland*, 407 F. Supp.2d 290, 298 (D. Me. 2006) ("Claims brought under the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4681 *et. seq.,* are interpreted in the same manner as claims brought under 42 U.S.C. § 1983, as the state (*continued on next page*)

*e.g., Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 124 n.2 (1st Cir. 1999) ("An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance if he had a realistic opportunity to prevent the other officer's actions.") (citation and internal punctuation omitted); *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 207 n.3 (1st Cir.1990) (defendant officers had no realistic opportunity to prevent attack where "the attack came quickly and was over in a matter of seconds.").

The Rockland Defendants posit, *inter alia*, that any claim of bystander liability against McLaughlin is fatally flawed in that he was not in a position to observe any unfolding problem and did not have a meaningful opportunity to intervene to stop it. *See* Rockland S/J Motion at 11. I agree that the cognizable evidence, even viewed in the light most favorable to Calvi, cannot support such a finding. There is no dispute that Calvi was handcuffed for a period of only ten to fifteen minutes, five to six minutes of which was consumed by transport to the Jail. *See* Rockland SMF ¶¶ 61, 85; Plaintiff's Opposing SMF/Rockland ¶¶ 61, 85. Thus, she was handcuffed at the scene for no more than ten minutes. Calvi produces no concrete evidence from which a trier of fact reasonably could conclude or infer that, during this interval, (i) Calvi or anyone else apprised McLaughlin of her problem with the handcuffs, (ii) McLaughlin was in earshot of any such conversation, (iii) McLaughlin observed Calvi's hand condition, or (iv) Calvi's hand condition was such, and McLaughlin's proximity to Calvi was such, that the condition should have been observable to him. McLaughlin accordingly is entitled to summary judgment with respect to those portions of the Complaint that state a cause of action against him (namely, Counts I and IV).

---

statute is modeled upon the federal."); *Norton v. Hall*, 834 A.2d 928, 933 n.3 (Me. 2003).

In any event, as the Rockland Defendants observe, *see* Rockland S/J Reply at 4-5, Calvi's claims against McLaughlin are flawed in other respects.  To the extent Calvi alleges that McLaughlin failed to prevent a violation of Rockland PD policy, she fails to state a claim pursuant to either section 1983 or the MCRA.  *See, e.g., Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 4 (1st Cir. 2005) ("[A] plaintiff claiming a § 1983 violation must allege that a person or persons acting under color of state law deprived him of a federal constitutional or statutory right.") (footnote omitted); *Learnard v. Town of Van Buren*, 164 F. Supp.2d 35, 45 (D. Me. 2001) (MCRA addresses violation of rights secured by United States and Maine constitutions and laws).

Arguably Calvi means to suggest that, in violating Rockland PD policy, the Rockland Defendants violated the requirements of a federal statute – the ADA.  *See* Plaintiff's S/J Opposition/Rockland at 12.  If so, she confronts two insurmountable obstacles: As noted above, she neither pleaded this cause of action in her complaint nor adduces sufficient evidence to survive summary judgment with respect to the threshold question whether she is disabled as that term is defined in the ADA.

Finally, even assuming *arguendo* that Calvi had laid a proper factual predicate for a finding that McLaughlin had a reasonable opportunity to prevent Smith from using excessive force against Calvi, I would find McLaughlin entitled to qualified immunity with respect to his failure to intervene. As discussed below, it was not clearly established, as of January 19, 2003, that use of *de minimis* force to handcuff an arrestee behind his or her back for a short period (no more than fifteen minutes) constitutes excessive force in circumstances in which the arrestee complains that the handcuffs are causing pain because he or she is disabled, injured or fragile, but the disability, injury or fragility is not obvious.

For the foregoing reasons, McLaughlin is entitled to summary judgment with respect to all claims against him (Counts I and IV of the Complaint).

### b. Smith

With respect to Calvi's claim that, in handcuffing her, Smith wielded excessive force against her, the Rockland Defendants contend that Smith (i) used only that degree of force minimally necessary to control Calvi, and (ii) in any event, he is entitled to qualified immunity inasmuch as a reasonable officer in his position would not have concluded that his conduct in handcuffing the plaintiff was unlawful. *See* Rockland S/J Motion at 12-15.  I agree.

As the First Circuit has clarified:

> Determining whether qualified immunity is available to a particular defendant at a particular time requires a trifurcated inquiry.  We ask, first, whether the plaintiff has alleged the violation of a constitutional right.  If so, we then ask whether the contours of the right were sufficiently established at the time of the alleged violation.  Finally, we ask whether an objectively reasonable official would have believed that the action taken or omitted violated that right.

*Acevedo-Garcia v. Monroig*, 351 F.3d 547, 563-64 (1st Cir. 2003) (citation and internal quotation marks omitted).  "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  *Wilson v. City of Boston*, 421 F.3d 45, 58 (1st Cir. 2005) (citation and internal quotation marks omitted).

In accordance with this tripartite analytical structure, I first consider whether the cognizable facts, viewed in the light most favorable to Calvi, establish that Smith employed excessive force in effectuating her arrest.  Those facts are that (i) Calvi had a birth defect, Swan Neck deformity, as a result of which she had three fingers on her left hand surgically straightened, *see* Plaintiff's Opposing SMF/Rockland ¶ 53; Rockland SMF ¶ 54; Plaintiff's Opposing SMF/Rockland ¶ 54, (ii) Calvi told Smith as he started to handcuff her that she had a hand disability, *see* Plaintiff's Opposing SMF/Rockland ¶ 52, (iii) Frier also told Smith that Calvi was frail and recovering from surgery, *see*

*id*., (iv) Calvi was handcuffed with her hands behind her back for a total of ten to fifteen minutes, *see* Rockland SMF ¶ 61; Plaintiff's Opposing SMF/Rockland ¶ 61, (v) for five to six minutes of that time she sat in the rear of Smith's cruiser during transport to Jail, *see id*. ¶ 85,  (vi) she told Smith the handcuffs were too tight and were hurting her, *see, e.g*., Plaintiff's Opposing SMF/Rockland ¶ 58, (vii) Smith observed Calvi crying during the trip to the Jail, *see* Plaintiff's Additional SMF/Rockland ¶ 128; Rockland Reply SMF ¶ 128, (viii) Calvi suffered an injury to her wrist and finger when she was handcuffed by Smith on January 19, 2003 that caused her to suffer severe physical limitations and extreme emotional distress, *see* Plaintiff's Additional SMF/Rockland ¶ 133, (ix) pursuant to Rockland PD policy in force at the time of Calvi's arrest, an impairment that caused an individual's hand to be crooked or disabled could be an impairment that would make it inappropriate to handcuff an individual, *see* Plaintiff's Additional SMF/Rockland ¶ 131; Rockland Reply SMF ¶ 131, and (x) pursuant to that policy, it was appropriate for an arresting officer to consider handcuffing an individual with his or her hands in front of him or her if a person complained or indicated he or she had an injury or disability, *see id*. ¶ 132.[40]

I conclude that, even crediting this version of events, a reasonable trier of fact could not find that Smith employed excessive force against Calvi.  The Fourth Amendment permits police officers to use "objectively reasonable" force to effectuate an arrest.  *Graham v. Connor,* 490 U.S. 386, 396-97 (1989).  Smith was responding to a report from a male caller that a female occupant of his home was brandishing a knife and that he (the caller) had locked himself in his room.  When the caller, Hayden, finally descended the stairs, he wanted to know if Calvi was there and was visibly shaking, clutching

---

[40] This is an extremely generous reading of the facts in Calvi's favor.  She sets forth several of these facts only in the context of denying the Rockland Defendants' facts.  *See, e.g*., Plaintiff's Opposing SMF/Rockland ¶¶ 52, 58-59, 62, 100-02, 110; *compare generally* Plaintiff's Additional SMF/Rockland.  A statement offered only for purposes of denial can, at most, controvert the statement to which it responds.  It cannot affirmatively set forth facts that are themselves cognizable on summary judgment.  To accomplish this end, Calvi should have also presented these facts in her statement of additional facts (affording the Rockland Defendants an opportunity to admit, (*continued on next page*)

his hands and looking around.  Frier at first said he could not find Calvi but then later produced her.  From this, Smith reasonably could have inferred that she had been hiding.  Calvi then confirmed that she had been brandishing a butcher knife.  In the circumstances, Smith reasonably decided to handcuff Calvi in effectuating her arrest (even though, as Calvi observes, *see* Plaintiff's S/J Opposition/Rockland at 10, she was then cooperative).

Calvi says that as Smith was handcuffing her, she told him she had a hand disability and Frier told him she was frail and recovering from surgery.  *See* Plaintiff's Opposing SMF/Rockland ¶ 52.  Nonetheless, Smith did not observe any hand deformity.  *See, e.g.*, Rockland SMF ¶ 60.[41]  It is undisputed that he double-locked the handcuffs to prevent them from further tightening, *see id.* ¶ 46; Plaintiff's Opposing SMF/Rockland ¶ 46, and there is no evidence that he applied them in a rough manner.  Calvi asserts that she informed Smith the handcuffs were too tight and were hurting her.  *See, e.g.*, Plaintiff's Opposing SMF/Rockland ¶ 58.  However, she does not say when she so informed him.  Smith observed her crying only during transport.  *See* Plaintiff's Additional SMF/Rockland ¶ 128; Rockland Reply SMF ¶ 128.  If she informed him of these problems after being placed in the cruiser, he reasonably could have decided to wait the five or six minutes it took to drive to the Jail before removing the handcuffs.

Moreover, even assuming *arguendo* that Calvi informed Smith of those problems prior to being placed in the cruiser, the focus of her complaint, by her own account, was that the handcuffs were too tight and were hurting her.  *See, e.g.*, Plaintiff's Opposing SMF/Rockland ¶ 58.  While, per Rockland PD policy, Smith at that juncture could have considered handcuffing Calvi's hands in front

---

deny, qualify and/or object to them).  Nonetheless, I have taken the "denial facts" into account in this case inasmuch as doing so is not outcome-determinative.

[41] Calvi states in conclusory fashion that Smith should have known his actions were causing pain and suffering to her, *see, e.g.*, Plaintiff's Opposing SMF/Rockland ¶ 60; however, she provides no concrete facts from which a trier of fact could conclude that her hand disability should have been obvious to Smith or to a reasonable officer in his position.

of her – and it is apparent in the light of hindsight that this would have been preferable – he reasonably could have decided that he had addressed the tightness problem adequately for purposes of the brief trip to the Jail by having taken the precaution of double-locking the handcuffs. *See, e.g., Peña-Borrero v. Estremeda*, 365 F.3d 7, 12 (1st Cir. 2004) ("[A] particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]") (citation and internal quotation marks omitted); *McDermott v. Town of Windham*, 204 F. Supp.2d 54, 65 (D. Me. 2002) ("[T]he fact that Cox continued to place McDermott in handcuffs despite her telling him that she suffered from osteoporosis, without more, does not rise to anywhere near the level of excessive force. In fact, Cox altered his normal procedures to the extent that he handcuffed McDermott in front of rather than behind her body.") (footnote omitted).

Even crediting, as I must, Calvi's assertion that she suffered severe physical and emotional harm as a result of the handcuffing, her version of events is barren of any concrete facts from which one could conclude that this degree of suffering was or should have been apparent to Smith during the ten or fifteen minutes she was handcuffed. In short, on the facts presented, no reasonable trier of facts could conclude that Smith's decision to handcuff Calvi, or the manner or length of the handcuffing, constituted an unconstitutional excessive use of force. *See, e.g., Peña-Borrero*, 365 F.3d at 12 ("In essence, appellant asserts a constitutional violation based on harsh language and handcuffing that was accomplished by pushing his arms behind his back, causing injury exacerbated by prior non-obvious injuries. Making only cursory reference to this claim in his brief, he suggests that, since no force was necessary to effectuate his arrest, any force was therefore unreasonable and excessive. In our view, however, the allegations demonstrate no more than the degree of physical coercion typically attendant to an arrest.") (citation and internal quotation marks omitted).

In any event, even assuming *arguendo* that Smith's handcuffing of Calvi did constitute excessive force, I conclude that Smith is entitled to qualified immunity. In so determining, I lean heavily on a well-reasoned opinion of the United States District Court for the District of New Hampshire – *Caron v. Hester*, No. CIV. 00-394-M, 2001 WL 1568761 (D.N.H. Nov. 13, 2001) (McAuliffe, J.). Although the court in *Caron* concluded that the defendant officer could be found to have used excessive force, it nonetheless determined that he was entitled to qualified immunity inasmuch as:

1.     At the time of arrest, it was not "clearly established that police officers use unlawful and excessive force when they handcuff a suspect behind the back, notwithstanding the suspect's unsupported claim to suffer from an injury that either prevents, or would be exacerbated by, such conduct." *Caron*, 2001 WL 1568761 at *8.

2.     "Consequently, a reasonable officer would not have understood that attempting to handcuff Caron with his hands behind his back amounted to a violation of Caron's right to be free of excessive force." *Id*. at *10.

The court observed:

> Although the Court of Appeals for the First Circuit has yet to confront this particular issue, several other courts have done so and concluded, at a minimum, that a suspect who displays no visible signs of being unusually vulnerable or fragile[] is not subjected to excessive force when a police officer uses customary, reasonable force in applying handcuffs or otherwise effecting an arrest.

>                        \*\*\*

> In light of the current legal landscape, the court cannot conclude that Caron had a "clearly established" right to be handcuffed in front (or not at all) after he informed Hester of his shoulder injury or, viewed somewhat differently, that he had a "clearly established" right not to be handcuffed with his hands behind his back once he invoked a shoulder injury.

*Id.* at *9-*10.[42]

My research confirms that the legal landscape looks no different today (and looked no different on January 19, 2003 – the day of Calvi's arrest) than when the *Caron* court examined it. No controlling precedent has issued from the Supreme Court or the First Circuit, and courts have continued to struggle with the difficult question of the circumstances in which use of routine handcuffing procedures can be found to constitute excessive force. *See, e.g., Gilles v. Davis,* 427 F.3d 197, 207-08 (3d Cir. 2005) ("In *Kopec* [*v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004)], we reversed the grant of summary judgment, but cautioned that the opinion should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims. . . . Unlike *Kopec*, where the plaintiff fell to the ground and fainted with pain, obvious visible indicators of Gilles' pain were absent (other than his alleged complaint that the handcuffs were too tight).") (citations and internal quotation marks omitted); *Rodriguez v. Farrell,* 294 F.3d 1276, 1278 (11th Cir. 2002) ("In the context of this case – a case in which Sgt. Farrell, after midnight on the side of the road, reasonably believed that Plaintiff (who, as we discussed in our original opinion, had no obvious signs of injury specifically to his arm) was a fugitive who had evaded capture, Sgt. Farrell's alleged discounting of Plaintiff's arm-injury claim (a claim not made until after Sgt. Farrell began to arrest Plaintiff despite the fact that he had been in Sgt. Farrell's company for roughly 30 minutes when the handcuffing began) was reasonable.") (footnote omitted); *Eason v. Anoka-Hennepin E. Metro Narcotics & Violent Crimes Task Force*, No. Civ.00-311 PAM/SRN, 2002 WL 1303023, at *6 (D. Minn. June 6, 2002) ("Courts . . . do not necessarily agree whether a plaintiff's assertions that he or she has a preexisting injury are sufficient, standing

---

[42] The court distinguished cases such as the one before it from cases in which suspects had "*visible* signs of an injury or medical condition that should have established the reasonable likelihood of a suspect's vulnerable condition and counseled against the level of force actually employed." *Caron*, 2001 WL 1568761, at *8 (emphasis in original). The court reasoned that "[i]n cases of that sort, it is both logical and reasonable to expect police officers to recognize that the suspect is potentially more susceptible to injury than the ordinary citizen and to require the officers to act accordingly." *Id.* However, in *Caron*, "the only 'evidence' of Caron's preexisting (*continued on next page*)

alone, to require an arresting officer to take such an injury into account. . . .  Requiring that there be an objective manifestation of the injury helps to ensure that police officers are not overburdened by having to take into account unsubstantiated and potentially falsified preexisting injuries while performing their duties.").

In short, in this case, as in *Caron*, (i) an officer used what ordinarily would be a customary, reasonable amount of force to handcuff an arrestee behind her back, (ii) the arrestee complained that the handcuffing was causing pain as a result of a preexisting (but non-obvious) condition, and (iii) the handcuffing, which ordinarily would have inflicted no lasting or noteworthy injury, injured the arrestee.  The law remained as unsettled on January 19, 2003 as it had been when examined in *Caron* with respect to the question whether such conduct can constitute excessive force.  A reasonable officer in Smith's position would not have understood that his conduct was unlawful.  Smith accordingly is entitled to qualified immunity.  *See, e.g., Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

Smith accordingly is entitled to summary judgment with respect to all claims against him (Counts I and IV of the Complaint).[43]

### 3.  Municipal-Liability Claim: Count II

In Count II of her complaint, Calvi seeks to hold the City of Rockland liable for the harms allegedly inflicted by its officers.  *See* Complaint ¶¶ 23-24.  To the extent this claim is predicated on

---

shoulder injury was his statement to that effect – a statement, no doubt, uttered by many suspects who, if given the choice, would prefer not to be handcuffed at all and, if they must be restrained in that manner, would prefer that the handcuffs be in front."  *Id.*

[43] From all that appears, Calvi brings no state-law tort claims against Smith.  *See* Complaint ¶¶ 14-28.  To the extent that she does, I agree with the Rockland Defendants that he is entitled to discretionary immunity pursuant to the MTCA.  *See* Rockland S/J Motion at 15; 14 M.R.S.A. § 8111(1)(C); *McPherson v. Auger*, 842 F. Supp. 25, 29 (D. Me. 1994) ("Officer Auger has the discretion under Maine law to use a reasonable degree of force when making an arrest and is entitled to immunity for his actions while making an arrest so long as he avoids 'wanton or oppressive' conduct.") (citations omitted).

section 1983, it rests, as a threshold matter, on Calvi's ability to generate a triable issue that either McLaughlin or Smith violated her constitutional rights. *See, e.g., Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 25-26 (1st Cir. 2005) ("Assessing liability against the City requires two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the City be responsible for that violation, an element which has its own components."). As discussed above, she fails to do so – a default that is fatal to her quest to hold the City of Rockland liable pursuant to section 1983 as a result of the officers' conduct.

In any event, even assuming *arguendo* that Calvi was injured as a result of a constitutional violation committed by McLaughlin and/or Smith, she falls short of demonstrating that the municipality should be held liable. Calvi concedes that, as of the time of her arrest, the Rockland PD had adopted an appropriate policy for handcuffing disabled individuals. *See* Plaintiff's S/J Opposition/Rockland at 13-14. However, she seeks to hold the City of Rockland liable based on its alleged failure to train Smith adequately with respect to that policy. *See id*. at 14.

As the First Circuit recently has observed:

> The Supreme Court, concerned that municipal liability based on fault by the City might collapse into de facto *respondeat superior,* has set a very high bar for assessing municipal liability under *Monell* [*v. Department of Soc. Servs.,* 436 U.S. 658 (1978)]. The alleged municipal action at issue must constitute a "policy or custom" attributable to the City. Further, the Supreme Court has imposed two additional requirements: 1) that the municipal policy or custom actually have caused the plaintiff's injury, and 2) that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as "deliberate indifference." Causation and deliberate indifference are separate requirements, although they are often intertwined in these cases.

*Young,* 404 F.3d at 26 (citations omitted). In the context of an allegation of failure to train, "deliberate indifference will be found where the municipality fails to provide adequate training notwithstanding an obvious likelihood that inadequate training will result in the violation of constitutional rights." *Whitfield v. Meléndez-Rivera*, 431 F.3d 1, 10 (1st Cir. 2005).

In this case, while Calvi adduces evidence that Smith had no formal training in the handcuffing of disabled individuals, she presents no evidence that Rockland police officers in general were inadequately trained in handcuffing disabled suspects or that any such deficiencies were (or should have been) so apparent as to render the City of Rockland deliberately indifferent. What is more, the Rockland Defendants adduce evidence that training in arresting individuals with physical disabilities is part of the Maine Criminal Justice Academy's basic law-enforcement program. *See* Rockland SMF ¶ 113; Plaintiff's Opposing SMF/Rockland ¶ 113. The evidence, even taken in the light most favorable to Calvi as nonmovant, falls short as a matter of law of establishing either (i) a general deficiency in training or (ii) a deficiency of such a nature that the City of Rockland could be said to have been deliberately indifferent to the welfare of the citizenry in failing to correct it. *See, e.g., St. Hilaire v. City of Laconia,* 71 F.3d 20, 29 (1st Cir. 1995) ("Evidence of a single incident is usually insufficient to establish a 'custom or usage.'") (citation omitted); *Pahle v. Colebrookdale Twp.*, 227 F. Supp.2d 361, 369 (E.D. Pa. 2002) ("While it is conceivable that . . . training and policies could be widely ignored, Plaintiffs have offered no evidence that Township officials did so. Plaintiffs' only allegations concern the single incident with Mr. Pahle. Plaintiffs failed to show a pattern of excessive force violations or inadequate training sufficient to establish municipal liability.").

To the extent that Calvi seeks to hold the City of Rockland liable as a matter of state law, the Rockland Defendants interpose the shield of the MTCA, arguing that no exception to its grant of absolute immunity obtains and that the city has not procured liability insurance that would act as a waiver of immunity. *See* Rockland S/J Motion at 19. Calvi offers no rejoinder to this argument, seemingly conceding the point. *See* Plaintiff's S/J Opposition/Rockland at 13-17; *see also, e.g., Grenier v. Cyanamid Plastics, Inc*., 70 F.3d 667, 678 (1st Cir. 1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be

considered or raised on appeal.") (citations and internal quotation marks omitted).  In any event, the Rockland Defendants are correct on the merits.

Pursuant to the MTCA, "all governmental entities" are immune from suit on tort claims seeking recovery of damages unless an exception codified at 14 M.R.S.A. §§ 8104-A or 8116 pertains.  *See* 14 M.R.S.A. §§ 8103(1), 8104-A & 8116; *Richards v. Town of Eliot*, 780 A.2d 281, 295 (Me. 2001).  Section 8104-A, which concerns (i) ownership, maintenance or use of vehicles, (ii) construction, operation or maintenance of public buildings, (iii) discharge of pollutants and (iv) road construction, street cleaning or repair, is inapposite.

Section 8116 "provides that, to the extent a municipality has obtained insurance for tort claims against it, the municipality is liable to the limits of the insurance coverage."  *Richards*, 780 A.2d at 295.  "[T]he governmental entity against whom a claim is made bears the burden of establishing that it does not have insurance coverage for that claim."  *Danforth v. Gottardi*, 667 A.2d 847, 848 (Me. 1995).  Calvi admits that the City of Rockland has no policy of liability insurance that provides indemnity to the city or its police officers for civil liability arising out of the events of January 19, 2003.  *See* Rockland SMF ¶ 118; Plaintiff's Opposing SMF/Rockland ¶ 118.  This is dispositive of the section 8116 issue.

For the foregoing reasons, the Rockland Defendants are entitled to summary judgment with respect to all claims against the City of Rockland (Count II of the Complaint).

### III.  Knox Defendants' Motion

#### A.  Factual Context

With respect to the motion for summary judgment of Knox County, Daniel Davey and Rebecca Gracie (the "Knox Defendants"), the parties' statements of material facts, credited to the extent either

admitted or supported by record citations in accordance with Local Rule 56 and viewed in the light most favorable to Calvi as nonmovant, reveal the following relevant to this recommended decision:

On January 19, 2003 Smith arrested Calvi on a charge of criminal threatening with a dangerous weapon. Defendants Knox County, Daniel Davey and Rebecca Gracie's Statement of Material Facts in Support of Motion for Summary Judgment ("Knox SMF") (Docket No. 41) ¶ 1; Plaintiff[] Morgan Calvi's Response to Defendants Rebecca Gracie, Sheriff Daniel Davey and Knox County's Statement of Material Facts with Additional Statements of Material Fact ("Plaintiff's Opposing SMF/Knox") (Docket No. 46) ¶ 1. Smith drove Calvi to the Jail. *Id.* ¶ 2. On that date Gracie was the assistant supervisor on duty at the Jail. Additional Statements of Material Fact ("Plaintiff's Additional SMF/Knox"), commencing at page 4 of Plaintiff's Opposing SMF/Knox, ¶ 34; Defendants Knox County, Daniel Davey and Rebecca Gracie's Response to Plaintiff's Statement of Additional Facts ("Knox Reply SMF") (Docket No. 51) ¶ 34. Her duties included supervising Jail employees to make sure they followed the Jail's policies and procedures. *Id.* ¶ 35.

When Calvi arrived at the Jail, Gracie conducted a pat-down search of her clothing before leading her into the booking room. Knox SMF ¶ 3; Plaintiff's Opposing SMF/Knox ¶ 3. Gracie placed Calvi in a holding cell located in the booking area. *Id.* ¶ 4. Gracie took Calvi's booking photograph and asked her some questions from pre-printed Jail forms. *Id.* ¶ 5. Gracie did not fingerprint Calvi. *Id.* ¶ 7.[44] That function was performed by another officer. Knox SMF ¶ 8; Calvi Dep. at 97.[45] Calvi stated that the officer had her roll her fingers on both hands on several different cards. Knox SMF ¶ 9; Plaintiff's Opposing SMF/Knox ¶ 9.[46]

---

[44] Calvi qualifies this statement. *See* Plaintiff's Opposing SMF/Knox ¶ 7. Inasmuch as the essence of her qualification is set forth elsewhere in this recitation of facts, I shall not repeat it here.

[45] Calvi purports to deny this statement, *see* Plaintiff's Opposing SMF/Knox ¶ 8; however, her assertions do not controvert it.

[46] Calvi qualifies this statement. *See* Plaintiff's Opposing SMF/Knox ¶ 9. Inasmuch as the essence of her qualification is set forth elsewhere in this recitation of facts, I shall not repeat it here.

On January 19, 2003 Officer James Roberts wrote on Calvi's fingerprint card, "fingerprints incomplete due to deformed hands."  Plaintiff's Additional SMF/Knox ¶ 31; Knox Reply SMF ¶ 31. Calvi's fingerprint card reveals that Roberts attempted to obtain at least two sets of complete fingerprints from Calvi.  *Id*. ¶ 32.  During the time Calvi was being fingerprinted she was crying hysterically.  Plaintiff's Additional SMF/Knox ¶ 37; Calvi Dep. at 112-13.[47]  Roberts kept taking Calvi's hand and pushing it down hard.  Plaintiff's Additional SMF/Knox ¶ 38; Calvi Dep. at 114.[48] On January 19, 2003 Roberts attempted to obtain Calvi's fingerprints on four separate occasions. Plaintiff's Additional SMF ¶ 39; Knox Reply SMF ¶ 39.  Gracie was present in the room with Calvi when Roberts attempted to fingerprint Calvi.  *Id*. ¶ 36.  Calvi suffered an injury to her wrist and finger as a result of the incidents that occurred at the Jail, which have caused her to suffer severe physical limitations and extreme emotional distress.  Plaintiff's Additional SMF/Knox ¶ 41; Calvi Aff. ¶¶ 8-14.[49]

Calvi does not know if she encountered Sheriff Davey while at the Jail on January 19, 2003. Knox SMF ¶ 11; Plaintiff's Opposing SMF/Knox ¶ 11.  Davey had no contact with Calvi on January 19, 2003.  *Id*. ¶ 12.  Davey is not aware of any incidents of officers failing to account for physical disabilities of incoming arrestees in the process of taking fingerprints.  *Id*. ¶ 13.  He is not aware of any incidents of officers using more force than is reasonably necessary in the process of taking

---

[47] I omit the balance of this statement, *see* Plaintiff's Additional SMF/Knox ¶ 37, which is neither admitted nor supported by the citation given.

[48] I omit Calvi's assertions that Roberts did this "when [he] could not get a clear print of Morgan Calvi's fingerprint" and that he pushed her hand down "as hard as he could."  Plaintiff's Additional SMF/Knox ¶ 38.  I also omit Calvi's assertion that Roberts "knew that he could not obtain fingerprints from Ms. Calvi because she had a deformed hand."  Plaintiff's Additional SMF/Knox ¶ 40.  With respect to all of these assertions, I sustain the Knox Defendants' objections that Calvi does not establish how she knew what Roberts was thinking.  *See* Knox Reply SMF ¶¶ 38, 40.

[49] The Knox Defendants' objection to this statement on the ground that it is based on hearsay (Calvi's own recitation of physicians' purported diagnoses that are nowhere of record), *see* Knox Reply SMF ¶ 41, is overruled.  Calvi's statement is based not only on physicians' diagnoses but also on her own personal observations and experience.  *See* Calvi Aff. ¶¶ 8-14.  The Knox Defendants alternatively deny the statement on the grounds that it is false, unsubstantiated and contradicted by ample additional evidence of record, including the treatment records of one of her doctors, *see* Knox Reply SMF ¶ 41; however, I view the cognizable evidence in the light (*continued on next page*)

fingerprints from incoming arrestees.  *Id.* ¶ 14.  The Jail policy with regard to booking and processing

arrestees is reflected in Policy C-111.  *Id.* ¶ 16.  The implementing procedures for fingerprinting are

discussed in more detail in a Booking Post Order dated October 1998 – a document to which booking

officers can refer in their daily work.  *Id.* ¶ 17.

For the period from January 1, 2003 through December 31, 2003, Knox County was a member

of the Maine County Commissioners' Association Self-Funded Risk Management Pool.  *Id.* ¶ 23.  The

Member Coverage Certificate issued to Knox County for that time period describes the coverage

available to Knox County under the Risk Management Pool.  *Id.* ¶ 24.  In pertinent part, the Member

Coverage Certificate in force for that period provides:

> Coverage is limited to those areas for which governmental immunity has been
> expressly waived by 14 M.R.S.A. 8104-A, as limited by 14 M.R.S.A. 8104-B, and 14
> M.R.S.A. 8111.  Coverage amounts for causes of action seeking tort damages pursuant
> to the provisions of the Maine Tort Claims Act are limited to those specified in 14
> M.R.S.A. 8105 and 8104-D.  Liability coverage shall not be deemed a waiver of any
> immunities or limitation of damages available under the Maine Tort Claims Act, other
> Maine statutory law, judicial precedent, or common law.  This coverage limitation for
> causes of action seeking tort damages pursuant to the provisions of the Maine Tort
> Claims Act shall serve as the written statement required pursuant to 14 M.R.S.A.
> 8116.

*Id.* ¶ 25.  Apart from the coverage afforded under the Risk Management Pool pursuant to Exhibit 1 to

the Affidavit of Jane Desaulniers, the County did not have any liability insurance coverage for the

calendar year 2003.  *Id.* ¶ 26.

On April 13, 1999 Gracie had pre-service training in fingerprinting individuals who were

brought to the Jail for processing.  Plaintiff's Additional SMF/Knox ¶ 27; Knox Reply SMF ¶ 27.  As

part of Gracie's pre-service training, she received instruction on how to deal with fingerprinting of

individuals who had some kind of disability or deformity of the hand.  *Id.* ¶ 28.  As part of Gracie's

pre-service training, she was taught that if an individual had a disability that prevented a fingerprint

---

most favorable to Calvi as nonmovant.

from being taken, she was supposed to write on the fingerprint card, in the spot where the print should be, the reason why the fingerprint could not be taken. *Id*. ¶ 29.  As part of Gracie's pre-service training, she was taught that if you had written on the form the reason that the print could not be taken, you were not supposed to attempt to take the fingerprint. *Id*. ¶ 30.  Gracie has not received any updated training in fingerprinting since April 1999. *Id*. ¶ 33.

## B.  Analysis

The Knox Defendants seek summary judgment as to all claims against them on the bases that:

1.      Neither Davey nor Gracie can be held liable pursuant to section 1983 or the MCRA for use of excessive force against Calvi inasmuch as neither was involved in fingerprinting her. *See* Knox S/J Motion at 7-8, 17.  In any event, both are entitled to qualified immunity. *See id*. at 8-10, 17.[50]

2.      Calvi's claim against Knox County fails inasmuch as she demonstrates neither an underlying constitutional violation nor a county custom, policy or practice that was a moving force behind any constitutional violation. *See id*. at 10-11.

3.      Davey and Gracie are entitled to summary judgment with respect to any state-law tort claims inasmuch as neither took actions that caused Calvi's injuries. *See id*. at 12.  In any event, both are entitled to discretionary immunity pursuant to the MTCA. *See id*. at 12-14.

4.      With respect to any state-law tort claims, Knox County is entitled to absolute immunity pursuant to the MTCA. *See id*. at 14-17.

---

[50] As the Knox Defendants observe, *see* Knox S/J Motion at 6, Calvi neglects to specify which constitutional or statutory provisions underpin her section 1983 claim, *see generally* Complaint.  I agree with the Knox Defendants that (i) Calvi's complaint cannot (even generously) be read to state a cause of action pursuant to the ADA, *see* Knox S/J Motion at 5 n.1; Complaint, and (ii) although the Supreme Court has not clarified which constitutional right is implicated by alleged use of force during the "legal twilight zone" between arrest and sentencing, it is unnecessary to resolve the issue inasmuch as Calvi's claim fails even pursuant to the most plaintiff-friendly Fourth Amendment "objective reasonableness" test, *see* Knox S/J Motion at 6-7; *Graham*, 490 U.S. at 395 n.10, 396-97; *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000).

5.     The Knox Defendants are entitled to summary judgment with respect to claims for punitive damages pursuant to both federal and state law.  *See id.* at 11-12, 17-18.

Calvi, in effect, concedes that Davey has no personal liability, *see* Plaintiff Morgan Calvi's Memorandum in Opposition to Knox County, Sheriff Daniel Davey and Rebecca Gracie's Motion for Summary Judgment ("Plaintiff's S/J Opposition/Knox") (Docket No. 45) at 6, entitling him to summary judgment.  I conclude that Gracie is entitled to judgment in her favor inasmuch as Calvi relies – impermissibly – on a newly minted theory of liability to resist summary judgment as to her.  Finally, I agree with the Knox Defendants that Knox County is entitled to summary judgment inasmuch as, for purposes of Calvi's constitutional claims, Calvi fails to demonstrate the existence of a custom, policy or practice that was the moving force behind any constitutional violation, and for purposes of any state-law tort claims, the MTCA confers absolute immunity.  I need not, and do not, reach the Knox Defendants' separate arguments regarding punitive damages.

### a.  Davey (Counts I, III and IV)

Calvi concedes that Davey "has no liability for his personal actions[,]" clarifying that she continues to press claims against him only in his "official capacity."  *See id.*  A suit against an individual in his official capacity is simply a suit against the individual's employer – in this case, Knox County, which already is a named defendant.  *See, e.g., Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").  Davey accordingly is entitled to summary judgment with respect to all claims against him (Counts I, III and IV).

34

### b.  Gracie (Counts I, III and IV)

Calvi clarifies that she "does not contend that Officer Gracie directly participated in the wrongful use of force."  Plaintiff's S/J Opposition/Knox at 4.  However, she seeks to hold Gracie liable for her alleged failure to intervene to stop Roberts from doing so.  *See id*.  In rejoinder, the Knox Defendants protest that this is a new theory, raised for the first time in opposition to summary judgment.  *See* Defendants Knox County, Daniel Davey and Rebecca Gracie's Reply Memorandum of Law in Support of Motion for Summary Judgment ("Knox S/J Reply") (Docket No. 50) at 2-3.  As they observe, *see id*., Calvi omitted mention of any alleged failure to intervene not only in her complaint but also in her response to an interrogatory pointedly asking her to describe all facts on which she relied to establish Gracie's violation of her constitutional rights, *see generally* Complaint; *see also* Plaintiff Morgan Calvi's Answers to Interrogatories of Defendant, Knox County, attached to Knox S/J Reply, ¶ 5 & attachment thereto.  She cannot rely on this newly minted theory to stave off summary judgment.  *See, e.g., Logiodice*, 170 F. Supp.2d at 30-31 n.12.  Gracie accordingly is entitled to summary judgment as to all claims against her (Counts I, III and IV).

### c.  Knox County (Count II)

In response to the Knox Defendants' bid for summary judgment as to Knox County, Calvi clarifies that she seeks to hold the county liable on a theory of failure to adequately train and supervise its officers.  *See* Plaintiff's S/J Opposition/Knox at 7-8.  She posits:

> A reasonable jury could find, given Officer Gracie's testimony, that she had not received any additional training in fingerprinting disabled individuals since she had originally been hired in 1999, that no other training had occurred and that the failure to refresh the Officers on the fingerprint policy was inadequate training.  A reasonable jury could also conclude that the training was inadequate because not one, but two Officers, when confronted with a situation which was governed by the policy, failed to follow the policy.

*Id*. at 8.

35

Even assuming *arguendo* that Roberts employed excessive force in fingerprinting Calvi on January 19, 2003, and Gracie, his supervisor, failed to intervene to stop it, I agree with the Knox Defendants that Calvi lays an insufficient predicate to establish municipal liability.[51]  As noted above, the bar for establishing municipal liability is set high; a plaintiff must demonstrate (i) the existence of a custom, policy or usage, (ii) deliberate indifference to citizens' welfare and (iii) causation.  *See, e.g., Young*, 404 F.3d at 26.  "Evidence of a single incident is usually insufficient to establish a 'custom or usage.'"  *St. Hilaire,* 71 F.3d at 29 (citation omitted).

The evidence, viewed in the light most favorable to Calvi, boils down to the following: (i) Knox County had in place an appropriate policy on the fingerprinting of disabled persons, *see* Plaintiff's Additional SMF/Knox ¶¶ 28-30; Knox Reply SMF ¶¶ 28-30, (ii) Gracie and Roberts did not follow this policy on January 19, 2003, *see* Plaintiff's Additional SMF/Knox ¶¶ 31-32, 36-38, and (iii) Gracie was trained with respect to this policy in 1999 but received no subsequent refresher training on it, *see id*. ¶¶ 27-30, 33; Knox Reply SMF ¶¶ 27-30, 33.  Calvi introduces no evidence tending to show that (i) there was a widespread failure to train officers with respect to the policy, (ii) Roberts lacked training, (iii) incidents had occurred that put Knox County on notice, or should have put it on notice, of a need for better or different training, (iv) the level of training actually provided to Gracie (or, for that matter, any other corrections officer) was deficient, or (v) the lack of refresher training was causally related to the alleged use of excessive force (for example, that as of January 19, 2003 Gracie had forgotten the contents of the policy).  Thus, Calvi presents insufficient evidence to establish that (i) Knox County had a custom or practice of insufficient training with respect to fingerprinting of disabled persons, (ii) Knox County was deliberately indifferent to the welfare of

---

[51] Roberts is not a defendant in this case.  Calvi states that Knox County represented that Roberts is serving on active duty overseas (precluding suit against him pursuant to the Soldiers and Sailors Relief Act).  *See* Plaintiff's S/J Opposition/Knox at 4.  The Knox Defendants assert that they do not believe the county ever made any such representation.  *See* Knox S/J Reply at 2 n.1.

its citizenry, or (iii) any default in training was causally linked to the incident of which she complains. Knox County (and Davey in his official capacity) accordingly are entitled to summary judgment with respect to claims asserted against them pursuant to section 1983 and the MCRA.

Calvi offers no response to the Knox Defendants' argument regarding any state-law tort claims asserted against Knox County, seemingly conceding that (i) she lodges no such claims against the county or (ii) the county is absolutely immune from suit with respect to such claims.  *See generally* Plaintiff's S/J Opposition/Knox; *see also, e.g., Grenier*, 70 F.3d at 678.  In any event, to the extent such claims are pressed, I agree with the Knox Defendants that Knox County (and Davey in his official capacity) are immune from suit.

As noted above, pursuant to the MTCA, "all governmental entities" are immune from suit on tort claims seeking recovery of damages unless an exception codified at 14 M.R.S.A. §§ 8104-A or 8116 pertains.  *See* 14 M.R.S.A. §§ 8103(1), 8104-A & 8116; *Richards*, 780 A.2d at 295.  Section 8104-A, which concerns (i) ownership, maintenance or use of vehicles, (ii) construction, operation or maintenance of public buildings, (iii) discharge  of pollutants and (iv) road construction, street cleaning or repair, is inapposite.

Section 8116 "provides that, to the extent a municipality has obtained insurance for tort claims against it, the municipality is liable to the limits of the insurance coverage." *Richards*, 780 A.2d at 295.  "[T]he governmental entity against whom a claim is made bears the burden of establishing that it does not have insurance coverage for that claim." *Danforth*, 667 A.2d at 848.  The Knox Defendants produce uncontroverted evidence that, as of the relevant time, they had no insurance coverage for Calvi's claim.  *See* Knox SMF ¶¶ 23-26; Plaintiff's Opposing SMF/Knox ¶¶ 23-26.

For these reasons Knox County (and Davey in his official capacity) are entitled to summary judgment with respect to all claims against them (Count II of the Complaint).

### IV.  Conclusion

For the foregoing reasons, I recommend that the motions of both the Rockland Defendants and

the Knox Defendants for summary judgment as to all claims against them be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 31st day of March, 2006.

> /s/ David M. Cohen
> David M. Cohen
> United States Magistrate Judge